## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

JASON M. LAKATOS D.O. FACOI
1200 Brickell Bay Drive, APT 3224
Miami, FL33131

   *Plaintiff,*

v.

ENVISION HEALTHCARE
1A Burton Hills Boulevard
Nashville, TN 37215

HCA HEALTHCARE
One Park Plaza
Nashville, TN 37203

   *Defendants.*

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

### COMPLAINT

  Comes Now Plaintiff Dr. Jason Lakatos, by and through his attorneys, and hereby sues Defendants Envision Healthcare and HCA Healthcare (Collectively, "Defendants") for wrongful termination and malicious interference with contractual rights.

  Dr. Jason M. Lakatos ("Dr. Lakatos") is an American Osteopathic Association ("AOA") and American Osteopathic Board of Internal Medicine ("AOBIM") certified internal medicine physician and Fellow of the American College of Osteopathic Internists ("FACOI"). Dr. Lakatos worked the "front line" of the COVID-19 pandemic. At a time when the world was more ignorant about the pandemic than it was knowledgeable, Dr. Lakatos dedicated himself to research in

1

pursuit of the best way to treat his COVID-19 patients.  Through his research, Dr. Lakatos identified medications and treatments that worked, lessening the time to recover from the viral infection.  To the best of his knowledge, Dr. Lakatos developed his own protocols with provable high cure rates for COVID-19 in any stage of the illness.

Unfortunately, Dr. Lakatos soon found himself in a battle not only with the virus, but also with Envision Healthcare and HCA Healthcare.  Starting in June 2020, Envision HCA pharmacists, central Pharmacists, and Chief Medical Officers ("CMOs") directly obstructed Dr. Lakatos' COVID-19 treatment efforts. The hospitals tried to force Dr. Lakatos to treat his COVID-19 patients with the experimental drug, Remdesivir, instead of the safe and effective treatment course he'd identified and successfully used for the previous two-and-a-half months.

Dr. Lakatos had already seen harm and ineffectiveness with using Remdesivir for COVID-19.  In fact, he monitored twenty-eight COVID-19 patients of other physicians that he was covering, and he noted a 50% mortality/death rate among the patients who received Remdesivir during its first month of use in  HCA hospitals.  He discussed the success he experienced using hydroxychloroquine and the ineffectiveness of Remdesivir with physician colleagues, pharmacists, chief medical officers, critical care physicians, and infectious disease doctors, and he reported his findings to the FDA and HHS Inspector General.

However, at the direction of HCA and Envision Healthcare administrators, Dr. Lakatos's orders were regularly being locked/canceled (not dispensed) by the pharmacists at HCA facilities without his consent.  Often the pharmacists would call him and recommend that he order Remdesivir.  However, pharmacists are not trained or licensed to diagnose, manage, or decide on treatment plans for patients. The pharmacists seemed to be forced to exceed their recognized scope of practice as pharmacists in Florida because they didn't have an answer to why it was the most

favorable treatment option for COVID-19 over hydroxychloroquine (besides it being recommended per HCA's COVID-19 Protocol).  By refusing to dispense Dr. Lakatos's prescriptions, HCA pharmacists grossly interfered with the patient/physician relationship and directly obstructed the autonomy of Dr. Lakatos to decide on a treatment plan for COVID-19 and to act in the best interest of his patients.

Ultimately, Dr. Lakatos was fired from one hospital and forced to resign from Envision altogether for refusing to treat his patients with a drug he not only found less effective, but in fact dangerous.

## PARTIES

1. Plaintiff Dr. Jason M. Lakatos is a citizen of the United States, residing in Miami-Dade County, Florida.

2. Defendant Envision Healthcare's public office is maintained at 1A Burton Hills Boulevard, Nashville, TN 37215.

3. Defendant HCA Healthcare's public office is maintained at One Park Plaza, Nashville, TN 37203.

## JURISDICTION AND VENUE

4. Plaintiff and Defendants have complete diversity as Plaintiff is in Florida and Defendants primary place of business are in Tennessee.

5. This Court has subject matter jurisdiction over Plaintiff's via diversity jurisdiction of citizenship claims pursuant to 28 U.S.C. § 1332.

6. Pursuant to 28 U.S.C. § 1332(a) this Court has subject matter jurisdiction over this matter as the amount in controversy exceeds, $75,000. To be exact, damages are $562,720.00.

7. Pursuant to 28 U.S.C. § 1332(a)(1) this Court has subject matter jurisdiction over this matter as the matter is between citizens of different States.

8.    This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367(a), and Chipley v. Atkinson, 23 Fla. 206, 1 So. 934 (Fla.1887).

9.    Venue is proper in the District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

10.    In October 2018, Dr. Jason M. Lakatos was recruited by Charles Collier of Envision Physician Services ("Envision Healthcare") via email.

11.    Envision Healthcare is a third-party employer that hires physicians and places them in various medical facilities in need of medical staff for three-to-six-month assignments.

12.    On November 13, 2018, after Dr. Lakatos had undergone a dinner interview with Kevin McGann D.O., Envision Physician Services, Inc.'s Medical Director at the West Regional Support Center, Envision Physician Services offered Dr. Lakatos a full-time traveling hospitalist "EmBassador" position, for which Dr. Lakatos would initially work at hospitals in Missouri, Oklahoma, and California.

13.    On December 18, 2018, Dr. Lakatos signed an employment agreement and completed the extensive credentialing packets for Envision Healthcare.

14.    Dr. Lakatos ultimately switched from the West division to the Southern division to work in Florida under Dr. Stephen Mitchell, the Regional Director for Envision's "EmBassadors" in Florida.

15.    Envision Physician Services completed the credentialing process for six hospitals in Florida owned and operated by Hospital Corporation of America ("HCA").

16.    Dr. Lakatos spent an arduous seven months interviewing, credentialing, and waiting to be placed at a hospital by Envision Physician Services.

17.    Dr. Lakatos eventually started his first assignment for Envision Physician Services for three months on the nightshift (6:00 a.m. to 6:00 p.m.) at Fort Walton Beach Medical Center in Florida.

18.    Dr. Lakatos worked the daytime and nighttime hospitalists shifts for the next eleven months at various HCA hospitals across Florida, including JFK Medical Center, Palms West Medical Center, Raulerson Hospital, Lawnwood Regional Medical Center, and Fort Walton Beach Medical Center without any known significant issues between Dr. Lakatos and Envision Healthcare or HCA healthcare.

19.    Dr. Lakatos was employed by Envision Healthcare as a traveling hospitalist physician for approximately two and a half (2.5) years.

20.    Dr. Lakatos was guaranteed and required to work 1800 hours per year per his employment agreement with Envision Healthcare/Envision Physician Services.

21.    Dr. Lakatos was earning $175 to $195 per hour while working for Envision Healthcare at several contracted HCA hospitals.

22.    During his employment with Envision Healthcare, Dr. Lakatos was placed in various hospitals with physician deficiencies including HCA Healthcare ("HCA") facilities.

23.    Envision Healthcare works closely with and specifically hires physicians to be placed in HCA facilities.

24.    According to their own website, HCA is "One of the nations' leading providers in healthcare services".

25.    HCA is comprised of 185 hospitals, over 2,000 sites of care, and does business in 20 states.

26.    Dr. Lakatos was assigned a daytime hospitalist three-month assignment at Capital Regional Medical Center in Tallahassee, Florida at the beginning of the COVID-19 pandemic in March 2020.

27.    Dr. Lakatos worked shifts that lasted seven days straight from 7:00 a.m. to 7:00 p.m., flying back and forth from his residence in Miami, Florida to Tallahassee, Florida.

28.    Despite the greater risk, he volunteered for assignments treating COVID-19 patients.

29.    Dr. Lakatos and the hospitalist program director, Dr. Billy Geers, were the two doctors who volunteered for and were chosen to manage all the COVID-19 floors of the hospital.

30.    This included any COVID-19 positive or suspected cases being admitted to the hospital.

31.    During the months of March, April, and May 2020, Dr. Lakatos began treating patients with COVID-19 ("COVID") and COVID symptoms at Tallahassee Capital Regional Medical Center, an HCA facility located in Tallahassee, Florida.

32.    At the time, the COVID-19 pandemic was in its early days; there were no proper protocols or procedures in place to combat the virus.

33.    Due to the lack of protocols, Dr. Lakatos applied his medical knowledge and research skills to identify medications that would aid in the fight against COVID and help his patients recover from an otherwise deadly disease.

34.    Dr. Lakatos also researched recent COVID-19 studies in China.

35.    One February 2020 study compared the efficacy of Chloroquine (analogous in treatment to hydroxychloroquine "HCQ") to that of Remdesivir (a previously failed treatment for the

Ebola virus and Hepatitis C). The laboratory study showed that Chloroquine, at high enough concentrations, completely inhibited viral replication of the virus. Chloroquine showed much greater inhibition of the virus in comparison to Remdesivir. Chloroquine inhibited viral entry into the cell and viral replication. It increased lysosomal pH and inhibited the virus's exit out of the cell. It also showed properties as a zinc ionophore, assisting zinc's entrance into cells where it can further inhibit virus replication. *See* Lancet 2020; 395: 1569–78 Published Online April 29, 2020, https://doi.org/10.1016/ S0140-6736(20)31022-9).

36.   From March 18, 2020, through March 22, 2020, Dr. Lakatos successfully treated one of the first confirmed COVID-19 patients in Florida at HCA Capital Regional Medical Center in Leon County-Tallahassee, Florida.

37.   Dr. Lakatos was able to successfully treat a 58-year-old COVID-19 patient (with multiple co-morbidities, including obesity, asthma/COPD, tobacco dependence, hypertension). The patient's acute hypoxemic respiratory failure (less than 90% blood oxygen saturation) resolved after only two doses of HCQ. The patient's oxygen saturations increased an incredible 7-9% overnight up to about 97% on room air. The patient's cough and fever had also resolved, and she felt so much better that she requested discharge from the hospital. In his personal free time, Dr. Lakatos followed up with the patient at home, and he called in a prescription for azithromycin for her to complete because Dr. Lakatos had just heard new information about its efficacy in decreasing the inflammation secondary to the viral infection. Three days later, Dr. Lakatos called the patient and she told him she was back to 100% and confirmed that his treatments had worked.

38.    In contrast, another patient in Leon County – Tallahassee, Florida's first confirmed COVID-19 patient – was a 39-year-old woman who died her first night at a different hospital where she did not receive the HCQ treatment.

39.    In addition to HCQ, Dr. Lakatos found that combining medications azithromycin, doxycycline, Zinc, Dexamethasone (Decadron), methylprednisolone (SOLUMEDROL), Vitamin C, Vitamin D3, Melatonin, and/or Ivermectin, Colchicine, Aspirin, Ibuprofen, Acetaminophen all had benefits to reduce the symptoms and duration of COVID-19 infection.

40.    Dr. Lakatos prescribed HCQ, azithromycin, and zinc with great success during the months of March, April, and May 2020.

41.    During those months, Dr. Lakatos estimates that he successfully treated and cured 40 to 60 COVID-19 patients while serving his role as "EmBassador Hospitalist" for Envision Healthcare at HCA Capital Regional Medical Center.

42.    Dr. Lakatos volunteered along with the medical director, Dr. Billy Geers, to be one of the two hospitalists/attending physicians for any patient with suspected or confirmed COVID-19.

43.    There were about 15 to 30 patients the two would be treating for typically 7 or 8 days from 7:00 a.m. to 7:00 p.m.

44.    Dr. Lakatos gained a vast amount of experience in managing these novel coronavirus patients including many high-risk patients with chronic illness, genetic disorders, down syndrome, heart defects, etc.

45.    Dr. Billy Geers considered Dr. Lakatos to be knowledgeable and helpful to other physicians regarding the currently accepted standard of care COVID-19 treatment protocol at the hospital.

46.    Dr. Lakatos also spent roughly 80 to 100 hours of his personal time scouring Pub Med/NIH/US National Library of medicine online researching SARS-1, MERS and other coronaviruses that were being experimented with in the Wuhan lab.

47.    Dr. Lakatos notified various medical staff about his successful treatment regiment, and the treatment regimen became the standard of care at Capital Regional Medical Center; by mid-April 2020, the regimen was included in the HCA COVID-19 treatment guidelines. Hydroxychloroquine/chloroquine, zinc, azithromycin were listed on the HCA guidelines for managing SARS-CoV-2/COVID-19.

48.    Dr. Lakatos was known to have successfully treated all of his COVID-19 patients without any known deaths (unless treatment was refused and hospice care was requested, as in one case).

49.    Dr. Lakatos strongly felt that he had indeed found a curative treatment regimen for COVID-19 and one without any significant side effects outside of simple effects (nausea, headache, diarrhea).

50.    The guidelines were suddenly and surprisingly changed around early June 2020.  The updated guidelines were based on one lackluster study sponsored by the NIH regarding the use of Remdesivir for COVID-19 patients.  There was no improvement in the mortality rate when Remdesivir was used vs. Placebo.

51.     Dr. Lakatos thoroughly reviewed the study and realized that hydroxychloroquine was allowed to be given with Remdesivir depending on the local guidelines as modified by Dr. Anthony Fauci.

52.     There was no data reported on how many patients may have received hydroxychloroquine, azithromycin, zinc, along with the Remdesivir arm of the study.  Dr Lakatos felt that these minor details likely skewed the study results.

53.     Notably, the World Health Organization has never recommended Remdesivir for use in COVID-19 patients, as they cited the great cost of the medication and the lack of any mortality benefit, risks of kidney failure and liver injury.

54.     Dr. Lakatos had continued success treating COVID-19 with Hydroxychloroquine, Azithromycin, Doxycycline, Zinc, Vitamin C, Melatonin, Solumedrol or Dexamethasone, Ivermectin, Budesonide nebulized, DuoNebs, Oxygen supplementation, BiPAP/CPAP or HiFLOW Oxygen as necessary for his patients.

55.     In discussions with physician colleagues at Capital Regional Medical Center, HCQ, azithromycin, solumedrol and zinc were not disputed as the best treatment options for COVID-19. They also discussed the treatments on WhatsApp in a group of around 50 doctors (of various specialties) including the Chief Medical Officer of the hospital.

56.     From June 2020 through August 2020, Dr. Lakatos began his next hospital assignments at three different hospitals, including Palms West Hospital in Royal Palm Beach, Florida; Fort Walton Beach medical Center in Fort Walton Beach, Florida; and Lawnwood Regional Medical Center in Fort Pierce, Florida.

57.     Dr. Lakatos admitted new patients to the hospital and managed emergency situations and phone calls for other physicians in the group that he covered. However, while working there he noticed a substantial number of SARS-CoV-2/COVID19 patients critically ill.

58.     Dr. Lakatos monitored these patients closely and kept a log regarding which of these patients survived the infection and which were deceased by the end of his coverage period.

59.     Dr. Lakatos viewed various imaging studies, blood work, ventilator settings, physician notes, and medications used for treatment in these patients.  Most notably, Remdesivir was used in each of these patients.

60.     Dr. Lakatos used other treatments to reduce the fluid or edema in the lungs of many COVID-19 patients with furosemide (LASIX), and he would see improvement in their oxygen saturation levels.

61.     From June 2020 until he was banned from Lake City Medical Center (first week of August 2021), HCA pharmacists began to block Dr. Lakatos's orders for specifically HCQ and ivermectin.

62.     Dr. Lakatos found that 14 of 28  of patients being treated with Remdesivir at Palms West Hospital had died within 2-4 weeks of becoming ill from COVID-19. Due to those results, Dr. Lakatos concluded that HCQ was a safer and more effective treatment option, because he had seen 0 deaths during the first 3 months of the pandemic while working at Capital Regional Medical Center in Tallahassee, Florida.

63.     As of June 2020, HCA required all COVID-19 patients to be treated with Remdesivir if they had confirmed positive COVID-19 and oxygen saturations were less than 93%. As a result, Dr. Lakatos attempted to contact both HCA pharmacists and the hospital Chief

Medical Officers (CMO's), Infectious disease doctors and others via emails regarding the ineffectiveness of this treatment.

64.    HCQ was even banned as an alternative treatment in cases where Remdesivir could not be used due to preexisting medical conditions such as chronic kidney disease or elevated liver enzymes (as it was shown in 20% to cause kidney damage and liver damage).

65.    During Dr. Lakatos's time at Lawnwood, Dr. Lakatos worked as a daytime & nighttime hospitalist and managed the care of 20 to 30 hospitalized patients daily. He admitted 14 to 24 new hospital patients on a nightly basis while covering phone calls and orders for around 150 to 210 patients of other physicians.

66.    During mid-June of 2020, Lawnwood began requiring all physicians attending COVID-19 patients to consult an infectious disease doctor in regard to said patients' treatment.

67.    Dr. Lakatos did not feel the consult was appropriate for all his COVID-19 patients as some were recovering well and already preparing for discharge.

68.    Dr. Lakatos was told by nursing supervisors, RNs, and Lawnwood Chief Medical Officer (CMO) Dr. Bakerman that Infectious Disease consultations were required for any suspected COVID-19 patient under his care. Dr. Lakatos objected to this idea and stated to the supervising physician that the mandatory consultation orders were illegal, fraudulent and an unnecessary bill for patients.

69.    Around that time, Dr. Lakatos saw an email from Dr. Michael Bakerman, the Chief Medical Officer at Lawnwood, stating that the hospital was one of four in Florida that was going to participate in a new COVID-19 drug trial with Remdesivir/VEKLURY Intravenous solution given through a peripheral IV.  There was a bonus payment (20%)

from Centers for Medicare & Medicaid Services (CMS) that hospitals could also receive toward the overall hospital bill for a confirmed COVID-19 patient that received the experimental drug Remdesivir ("Veklury").

70.    The hospitals tried to force Dr. Lakatos to treat his COVID-19 patients with this experimental drug Remdesivir instead of the safe and effective treatment course he had identified and successfully used for the last two-and-a-half months.

71.    Dr. Lakatos learned that one of his patients had been told during an infectious disease consultation that he would die if he didn't consent to a longer hospital stay and experimental Remdesivir treatment. The patient had already received hydroxychloroquine and was feeling much improved and asked to be discharged to his home.  Dr. Lakatos believed the consult was unnecessary and delayed the patient's discharge home. The Remdesivir treatment was also extremely expensive and reportedly cost $3500 for a 5-day IV treatment with the experimental drug.

72.    Dr. Bakerman told Dr. Lakatos that he was required to order an Infectious Disease consult or he would no longer be practicing medicine at Lawnwood Regional Medical Center.

73.    Dr. Bakerman instructed the nursing staff on several occasions to put in the order for Infectious Disease consultation under Dr. Lakatos's name when or if he refused.  This new requirement greatly *hindered* Dr. Lakatos in his ability to perform his medical duties to his patients.

74.    This also caused Dr. Lakatos to suffer embarrassment when treating his COVID-19 patients.

75.     Dr. Lakatos was intimidated by the threat of losing his livelihood but didn't feel that the CMO could legally force him to consult another physician under these circumstances.  He

13

also did not feel comfortable fleecing his patients for more money and longer hospital stays. In an effort to compromise, Dr. Lakatos consulted infectious disease physicians when he felt it was appropriate for the case, or if the patient requested consultation.

76.  At each hospital, Dr. Lakatos was credentialed and thus fully approved to diagnose, manage, and treat patients with any infectious disease and was not required to request a consultation from another physician.

77.  In mid to late June of 2020, pharmacists at both Lawnwood Regional Medical Center and Palms West Medical facilities began denying Dr. Lakatos's patients' prescriptions for HCQ. This prescription stoppage not only *hindered* Dr. Lakatos from performing his medical duties, but also *endangered* the lives of his patients.

78.  The stoppage was accomplished illegally when HCA pharmacists made healthcare treatment decisions far beyond their own medical knowledge and capabilities. The pharmacists interfered with the sacred patient-physician relationship and defamed Dr. Lakatos as a result when his orders were barred.

79.  The pharmacists that did allow his orders to be dispensed were often reprimanded by the corporate directors.

80.  There were mechanisms in place for the Chief Medical Officers to be alerted if a physician ordered hydroxychloroquine or ivermectin for the treatment of COVID-19.

81.  Despite all of his previous success treating COVID-19 with HCQ and/or azithromycin and/or Zinc, Dr. Lakatos was now banned from using that key medication as a form of treatment. Vitamins and minerals such as Vitamin C and Zinc were still allowed to be

ordered for patients but were not recommended in the HCA COVID-19 Treatment Guidelines.

82. Dr. Lakatos spoke with his physician colleagues about the poor mortality numbers amongst patients treated with Remdesivir during its first month of use in HCA hospitals.

83. Dr. Lakatos also spoke to his co-workers (fellow hospitalist physicians, pharmacists, chief medical officers, critical care physicians, and infectious disease doctors) to make them aware of his findings regarding the failures of Remdesivir and the success using hydroxychloroquine/ivermectin as part of his treatment regimen from June 2020 until August 2021.

84. Dr. Lakatos reported his findings to the FDA and HHS Inspector General in June/July 2020.

85. Dr. Lakatos never received any response from the Chief Medical Officers who were always included in the emails.

86. Dr. Lakatos refused to follow guidelines that recommended treatments that he had seen with proven harms and limited efficacy. Instead, Dr. Lakatos followed his sworn Osteopathic & Hippocratic Oath to do no harm.

87. For seemingly financial and political reasons rather than treatment efficacy, HCQ and Ivermectin were universally banned in HCA facilities for COVID-19 treatment purposes. Whenever Dr. Lakatos attempted to prescribe these medications at HCA facilities, he was inevitably blocked by the pharmacist.

88. In some cases, Dr. Lakatos would prescribe his traditional method of treatment, only to find that his orders would be changed the next day by another physician. The treatment

was always changed to Remdesivir despite its ineffectiveness, high cost, and potential for terrible side effects including death.

89.    Dr. Lakatos would have to return to speak to his patients and explain that his orders had been blocked and were not allowed to be given for COVID-19.

90.    He felt like he was being forced to withhold lifesaving treatment and information by giving half-truths to his patients in order to keep his job.

91.    In July 2020, there was a retrospective study published from Henry Ford Hospital in Detroit, Michigan which concluded a 50% decreased mortality rate/risk of death for COVID-19 patients treated with hydroxychloroquine without significant side effects of treatment.

92.    Dr. Lakatos informed via email, verbally, text messages, and phone calls the results of this study to various co-workers within the hospital including his hospitalist medical directors, CMOs, and CEOs.

93.    Dr. Lakatos received minimal to no interest or responses from the HCA or Envision Healthcare senior leadership.

94.    During the month of April 2019, Dr. Lakatos began working at Fort Walton Beach Medical Center in Fort Walton Beach, Florida. Fort Walton Beach Medical Center is an HCA facility. Dr. Lakatos also covered shifts intermittently from July 2020 until June 2021 at Fort Walton Beach Medical Center during the COVID-19 pandemic.

95.    Dr. Lakatos also began working at Raulerson Hospital in Okeechobee, Florida. Raulerson Hospital is also an HCA facility. Both Fort Walton Beach Medical Center and Raulerson

Hospital began to participate in the practices of previous institutions, denying and/or stopping prescriptions sent to the pharmacist.

96.   Again Dr. Lakatos had his ability to perform his duties hindered by someone who was entirely overstepping their own expertise. While working at these institutions, Dr. Lakatos notated within patient records that his attempts to order prescriptions had been blocked by the pharmacist.

97.   After making such notations, Dr. Lakatos was verbally disciplined and told that he could not make such statements regardless of their veracity. Even when Dr. Lakatos's patients themselves requested a treatment combination of Hydroxychloroquine and/or Ivermectin, the request was denied by an HCA pharmacist.

98.   While working at Raulerson and Fort Walton Beach, Dr. Lakatos also still worked at Lawnwood.

99.   Around the time of January 2021, Lawnwood pharmacists started flatly refusing to fill Dr. Lakatos's prescriptions without confirmation from Lawnwood CMO, Dr. Bakerman.

100.   Around February 4 or 5, 2021, at 10:00 p.m., Dr. Lakatos voiced his concerns during a phone call with Dr. Bakerman regarding Lawnwood treatment practices and procedures as well as the alterations of his orders.  Dr. Lakatos stated to Dr. Bakerman that he was receiving emails from him instructing him on how to properly commit the fraud and stated to Dr. Bakerman that he was not going to lie on HCA's behalf in his notes regarding these patients.  Dr. Lakatos also explained to Dr. Bakerman that what the pharmacists were doing is essentially practicing medicine without a license. *See* Section 465.003, Florida Statutes (2022):

(13) "Practice of the profession of pharmacy" includes compounding, dispensing, and consulting concerning contents, therapeutic values, and uses of any medicinal drug; consulting concerning therapeutic values and interactions of patent or proprietary preparations, whether pursuant to prescriptions or in the absence and entirely independent of such prescriptions or orders; and conducting other pharmaceutical services. For purposes of this subsection, "other pharmaceutical services" means the monitoring of the patient's drug therapy and assisting the patient in the management of his or her drug therapy, and includes review of the patient's drug therapy and communication with the patient's prescribing health care provider as licensed under chapter 458, chapter 459, chapter 461, or chapter 466, or similar statutory provision in another jurisdiction, or such provider's agent or such other persons as specifically authorized by the patient, regarding the drug therapy. However, nothing in this subsection may be interpreted to permit an alteration of a prescriber's directions, the diagnosis or treatment of any disease, the initiation of any drug therapy, the practice of medicine, or the practice of osteopathic medicine, unless otherwise permitted by law.

101.  The pharmacists hijacked the doctor & patient relationship and enforced a treatment plan that guaranteed the highest possible reimbursement from CMS/Centers for Medicare/Medicaid Services through the CARES Act.  There was a 20% bonus attached to the administration of Remdesivir. This bonus was quite exorbitant and Dr. Lakatos had never seen it before in his 9 years of practice.

102.  On February 6, 2021, Dr. Bakerman decided to report Dr. Lakatos to the regional director for Envision and threatened to have him "blackballed" and banned from ALL HCA facilities.    However, the following day Dr Lakatos was told by co-workers that Dr. Bakerman wanted an apology of some sort.

103.  Dr. Lakatos was able to negotiate a deal to use ivermectin to treat COVID-19 patients if he agreed not to order hydroxychloroquine anymore. Dr. Lakatos agreed to use ivermectin as he was familiar with a study showing synergy between ivermectin and remdesivir for COVID-19.

104.    These threats were a direct result of both Dr. Lakatos's attempts to prescribe HCQ, as well as his whistleblowing about many of the illegal medical practices undertaken at HCA Lawnwood Regional Medical Center.

105.    Dr. Lakatos felt admonished and very uncomfortable with continuing to work at this facility, so he requested a transfer at this time through Dr. Stephen Mitchell of Envision Envoy Program's Regional Director.

106.    It took about 3 months before he was transferred to a new hospital called Lake City Medical Center in Lake City, Florida (a small town near the Georgia border). From May 30 to June 3, 2021, Dr. Lakatos was requested to cover daytime shifts at Lawnood's "sister" hospital nearby in Okeechobee, Florida at Raulerson Hospital.

107.    On the second day at Raulerson, Dr. Lakatos had a COVID-19 patient who was being admitted to the critical care unit.  Dr. Lakatos ordered his typical COVID-19 orders that he had been successfully using at Lawnwood over the last several months including Ivermectin.  When speaking to the patient about treatment options the patient stated that one of his relatives had been cured of COVID-19 at this hospital with ivermectin and he would like to receive this medication as well.  Dr. Lakatos told the patient that he had already planned to order it for him, along with dexamethasone along with other standards of care for a viral infection (such as oxygen supplementation, nebulizers, cough suppressants, anti-pyrectics, Vitamins C & D etc.).

108.    Unfortunately, Dr. Lakatos received a phone call from the pharmacist stating he wasn't allowed to use this medication (Ivermectin) for COVID-19 specifically. Hydroxychloroquine was neither allowed for treatment of COVID-19.  He tried to reason

with the pharmacist and direct him to studies showing efficacy, but the pharmacist said it didn't matter as this was HCA corporate policy.

109. Dr. Lakatos was then approached in the physician's lounge while working on the computer by the Chief Medical Officer, Dr. Jorge Gonzalez, and one of the pharmacists at Raulerson. They had a 20-minute discussion about ivermectin where Dr. Lakatos stated Dr. Bakerman at the sister hospital approved his use of it and how he didn't understand why this was a problem at this facility.

110. Dr. Lakatos informed both that it was illegal under the Florida Statutes for a pharmacist to interfere with a physician's treatment plan and orders. He stated that it would violate his Osteopathic Oath to use a medication he has seen hundreds of other physicians' patients die after receiving it for COVID-19.

111. Dr. Gonzalez stated he would have to comply with HCA's Guidelines or not be allowed to work at the facility. He also stated he was going to speak to Envision about this discussion. As such, Dr. Lakatos's orders were not dispensed to the patient.

112. After completing the four shifts over Memorial Day weekend, Dr. Lakatos was called by Dr. Stephen Mitchell about a week later and told that he was now banned by the CEO from working at Raulerson Hospital due to his attempts to treat COVID-19 with ivermectin.

113. He was warned by Dr. Stephen Mitchell that CEOs often communicate with each other and that he would need to be very careful at the next hospital or he might get terminated there as well.

114. In June 2021, Dr. Lakatos began working days as a hospitalist physician at Lake City Medical Center in Lake City, Florida. Lake City Medical Center is also an HCA facility.

115. During orientation in May 2021, Dr. Lakatos asked the Director of Pharmacy (David Newman PharmD) if he would be allowed to use HCQ or ivermectin for COVID-19 treatment. The pharmacist stated that Ivermectin was not available, but HCQ was, and he saw no issue with him using it to treat COVID-19.

116. Thus, from June 2021 through about July 27, 2021, Dr. Lakatos was permitted to use the treatments he saw fit for COVID-19 including HCQ.

117. On July 27, 2021, Lake City Medical Center pharmacists began denying prescriptions sent by Dr. Lakatos. Dr. Lakatos was told that HCQ wasn't even allowed for COVID-19 patients who failed to benefit from Remdesivir or cases where it was contraindicated to use.

118. Dr. Lakatos believed the pharmacists were diverting from their standard of practice, exceeding their training and competencies, and violating the doctor and patient relationship in making treatment decisions.

119. Dr Lakatos also found out that another pharmacist (Timothy Shuler RPH) was reprimanded for discussing hydroxychloroquine as a viable treatment for COVID-19 with Dr. Lakatos via the secured messaging system. Dr. Lakatos was told the decision to block his orders had been made by the HCA corporate Pharmacists.

120. Dr. Lakatos asked for the contact information of the Corporate Director of Pharmacy for HCA but was not given it. He was told they would give him a call to discuss why his hydroxychloroquine orders were now being suddenly blocked. Dr. Lakatos was never called or given any explanation by the hospital leadership, the Director of Pharmacy, or Corporate Director of Pharmacy for HCA.

121.   Dr. Lakatos was told by one of Lake City Medical Center's pharmacists, Timothy Shuler, that he was a Registered Pharmacist for 29 years and that what he was doing by blocking/canceling/not dispensing Dr. Lakatos's orders was illegal and stated that the Joint Commission would have a field day with this if they found out.

122.   Timothy Shuler RPH stated via direct secured messaging in the hospital that he personally had treated himself with Ivermectin for COVID-19 and his symptoms had resolved within a few days and his COVID-19 related rash disappeared within hours.

123.   This pharmacist even had a friend with COVID-19 in the critical care unit at the hospital and he was personally pleading to the critical care physician to give his friend Ivermectin as he knew how well it worked.

124.   Dr. Lakatos continued to attempt to discuss the effectiveness of HCQ and his other treatment options for COVID-19 with pharmacists, fellow physicians, and the HCA hospitalist medical director Dr. Mustafa Dominguez.  Per his request, he sent the hospitalist director a list of web links to over 30 studies showing the benefits of treating COVID-19 with hydroxychloroquine and ivermectin.

125.   Due to his treatment by HCA and their previous and ongoing threats, Dr. Lakatos felt that he would likely soon be fired from the hospital staff due to the ongoing dispute about the management of his COVID-19 patients.

126.   Dr. Lakatos heard his colleagues stating that about 4 or 5 out of their 20 to 25 COVID-19 patients died each day.

127.   Dr. Lakatos had several patients ask for treatment of their COVID-19 with HCQ and Ivermectin while at Lake City Medical Center.

128.   Despite Dr. Lakatos's service to his patients and high success rate in treating COVID-19, his fears of termination would soon come true.

129.   The HCA hospitalist medical director, Dr Dominguez, informed Dr. Lakatos that he was going to be fired from the hospital and he had to leave immediately at or about 12:00 p.m. on August 5, 2021. Dr. Dominguez stated that this was at the request of the CEO Jill Adams.

130.   Dr. Dominguez also told Dr. Lakatos that a patient with COVID-19 had complained the hospital "wanted to kill them".  As a result, Dr. Lakatos was told he was to blame for the patient's disgruntlement.

131.   Dr. Lakatos noted to Dr. Dominguez that the patient had already been treated with 5 days of Remdesivir and her COVID-19 Pneumonia and respiratory failure was only worsening. She reported that her husband at home was cured of his COVID-19 infection within a few days of being treated with ivermectin. During their conversations, Dr. Lakatos never told the patient that the hospital wanted to kill her.

132.   Dr. Dominguez then told Dr. Lakatos that he may have also violated HIPAA by posting part of a case report to his Instagram story.

133.   Dr. Lakatos showed Dr. Dominguez his post declaring there was 0 identifying patient information on his post and that he was trying to spread knowledge that hydroxychloroquine was an effective treatment for COVID-19.

134.   Dr. Lakatos did not identify Hospital Corporation of America or Envision Healthcare in his story/post.

135.   Dr. Lakatos's post had already lapsed after 24 hours on his page during this discussion with Dr. Dominguez.

136.    HCA made false claims including a trumped-up HIPAA violation in a thinly veiled attempt to hide its true reasons for wanting Dr. Lakatos gone.  He refused to use experimental, less-effective drugs on his patients just because they made the hospital more money.

137.    HCA Lake City Medical Center's HIPAA PRIVACY AND INFORMATION MANAGEMENT packet under the Information Security section regarding federal HIPAA Security Law explicitly states, "There are 3 levels of security sanctions that require disciplinary action against an employee (up to and including termination):

    a.    Accidental and/or due to lack of proper education – verbal
    b.    Purposeful break in the terms of the confidentiality agreement or an unacceptable number of previous violations – written
    c.    Purposeful break in the terms or in an unacceptable number of previous violations and accompanying verbal disclosure of patient information regarding treatment and status – suspension/termination.

138.    Dr. Lakatos apologized for the misunderstanding regarding his Instagram story post.

139.    Dr. Lakatos stated to his medical director (Dr. Dominguez) and Lake City Medical Center's recently appointed CEO (Jill Adams) that he didn't commit a HIPAA violation by his social media post.  There was no identifying patient information disclosed on his post, such as the patient's name, birthday, hospital, bed number, medical record number, address, phone number, etc.

140.    Around August 5, 2021, Dr. Lakatos was verbally reprimanded/yelled at for several minutes and told he would never step foot in another HCA facility again by new CEO Jill Adams in her office with medical director Dr. Dominguez as a witness.

141.    During a phone call on August 20, 2021, Dr. Stephen Mitchell (the Southern Regional Director for Envision Healthcare's Ambassador/hospitalist program) agreed with Dr. Lakatos that he did not violate HIPAA in any way.

142.    To date so far, Dr. Lakatos was never mailed or emailed a written communication that was required per his employment contract with Envision Healthcare, stating why he was not allowed to complete the 16 shifts he had already been scheduled for the month of August 2021 at Lake City Medical Center and why his next 3 months were now being canceled.

143.    Dr. Lakatos was also never mailed or emailed a written communication stating why he was being barred from returning to work at any HCA facility in the country.

144.    Dr. Lakatos was never formally mailed a written communication stating why Envision Healthcare was effectively terminating his employment contract after 29 months of service.

145.    Dr. Lakatos only missed 3 shifts during his time employed by Envision Healthcare around July 17 to 20, 2021, when he contracted COVID-19 himself at Lake City Medical Center and cured himself with hydroxychloroquine, zinc, vitamin C, and melatonin, which he was supposed to be reimbursed for per Envision Healthcare and HCA healthcare contracts.

146.    Around the second week of August 2021, HCA Lake City Medical Center CEO, Jill Adams was able to effectively ban/blackball Dr. Lakatos from every HCA facility in the country. Dr. Stephen Mitchell of Envision Physician Services told Dr. Lakatos that Jill Adams had convinced others within corporate HCA that he would no longer be allowed to treat any patients in their facilities.

147.    Dr. Lakatos was also told by Dr. Mitchell that there would be no hospitals he could be placed at to work in the future as most Envision contracted hospitals were through HCA.

148.   Dr. Mitchell stated that HCA could not find any patient cases with grave outcomes to use against him or they would have reported him to the National Practitioner's Database.

149.   Dr. Lakatos was told he would have to send in a resignation letter to Envision and HCA and voluntarily resign his hospital staff privileges at 10 different HCA hospitals. If this letter was not received by September 2021, he would be reported to the National Practitioners Database for "unprofessional behavior" and likely unable to secure future employment in any hospitals, not just HCA facilities.

150.   Faced with no other option, Dr. Lakatos sent this involuntary, coerced resignation letter to Envision and HCA resulting in his wrongful termination of employment.

151.   Dr. Lakatos contact stated that it was a 90 days notice for termination and would usually average about 18 twelve hour shifts, which at his hourly rate would be at minimum $175 and max $195 per shift.

152.   Dr. Lakatos's contract guaranteed 180 shifts. When he was wrongfully coerced into signing his termination he has completed about 112 shifts, missing out on about $159,120. This is excluding overtime and other shifts. This was during a pandemic which would entail more shifts available to Doctors.

153.   Dr. Lakatos attempted to gain new hospital employment over the next several months of 2021 and 2022 but was unsuccessful due to his effective banning from HCA healthcare.

154.   Dr. Lakatos struggled to find a new hospitalist position due to the new hospitals and companies requesting recommendations from past hospitalist positions.

155.   Consequently, Dr. Lakatos had to resort to telemedicine through America's Frontline Doctors from September 2021 until February 2022 making over $32,000.

156.    Dr. Lakatos was averaging $35,100 a month, made substantially less money after his loss of employment with Envision Healthcare. The difference was about $143,000 during his time at America's Frontline Doctors.

157.    Dr. Lakatos eventually gained brief locums employment working for only 1 week for Advent Healthcare where he was again banned from their healthcare system for ordering hydroxychloroquine and ivermectin for one COVID-19 patient who was also under hospice care for rheumatoid arthritis (even though HCQ is an FDA approved treatment for rheumatoid arthritis).

158.    Dr. Lakatos was offered a position as a hospitalist in the Virgin Islands for 3 months starting June 2022 until August 2022.  However, this offer was rescinded after Dr. Lakatos informed the recruiter about his forced resignation and potential lawsuit against Envision Healthcare and HCA.

159.    Dr. Lakatos between February 2022 and August 2022, about 6 months, did not get a job and was paid around $20,000 which was missed wages of about $190,600.

160.    However, as of August 2022, Dr. Lakatos eventually was able to return to his previous employer Cape Coral Hospitalists, but about $70,000 less in total compensation.

## <u>COUNT I</u>
### Wrongful Discharge Under State Law
### (All Defendants)

161.    Plaintiff realleges and incorporates paragraphs 1 through 154 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

162.   An employment relationship existed between Dr. Lakatos and Envision Healthcare.

163.   Defendants wrongfully, intentionally, or maliciously discharged Dr. Jason M. Lakatos when Dr. Lakatos prescribed a treatment that diverged from the one indicated by HCA Healthcare, which, in this relationship, is a third party.

164.   Dr. Lakatos was terminated from one hospital and forced to resign from HCA Healthcare as a whole because higher level members associated Dr. Lakatos's preferred treatment for COVID-19 with negative political ideologies.

165.   As a result of his termination/forced resignation, Dr. Lakatos suffered damages when his contract (with definitive terms) was canceled. He was subjected to threats, harassment, hate, contempt, ridicule, and embarrassment because he did not want to commit illegal acts and fraud on behalf of the company.

166.   HCA Healthcare officers began to retaliate and take negative actions towards Dr. Lakatos after he spoke up regarding what was happening at the hospitals.

167.   WHEREFORE, Plaintiff demands compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other costs as permitted by law.

## COUNT II
### Malicious interference with contractual rights Under State Law
### (All Defendants)

168.   Plaintiff realleges and incorporates paragraphs 1 through 120 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

169.   A full-time employment relationship existed between Dr. Jason M. Lakatos and Envision Healthcare.

170. Dr. Jason M. Lakatos satisfactorily performed the obligations of his employment agreement with Envision Healthcare

171. Dr. Lakatos followed the HCA hospital bylaws & worked within the scope of his granted internal medicine hospitalist "privileges" at each HCA hospital.

172. HCA Healthcare maliciously interfered with Dr. Lakatos and Envision Healthcare's contractual rights because they restrained him in his capacity to prescribe treatments to his patients.

173. As a result, HCA Healthcare committed the crime of "Culpable Negligence" by their course of conduct showing reckless disregard for human life or for the safety of persons exposed to the dangerous effects of Remdesivir and retaliated against Dr. Lakatos when he chose to speak up.

174. HCA Healthcare committed the crime of "Culpable Negligence" when they ordered their employed pharmacists to block the orders of Dr. Lakatos and/or not dispense the life-saving medications for COVID-19; ivermectin and hydroxychloroquine.

175. Dr. Lakatos did not want to be charged as an accomplice or tied to the illegal acts so he chose to speak up, but he was fired instead.

176. Envision Healthcare intentionally, maliciously, or wrongfully terminated Dr. Lakatos because Dr. Lakatos decided to use a different treatment than the one indicated by HCA Healthcare, which was solely based on a financial incentive to the hospitals.

177. Dr. Lakatos has suffered irreparable harm to his reputation, job prospects, mental anguish and hundreds of thousands of dollars in monetary losses, as a result of his forcible resignation from Envision Healthcare and Hospital Corporation of America in September 2021.

178.    WHEREFORE, Plaintiff demands compensatory and punitive damages against

Defendants, jointly and severally, in an amount to be determined at trial, together with

reasonable attorney's fees, expert witness fees, and other cost as permitted by law.

**COUNT III**
**Breach of Contract and the Duty of Good Faith and Fair Dealing**
**(All Defendants)**

179.    Dr. Lakatos realleges the above statement of facts as though fully stated here.

180.    Defendants breached their contract with Dr. Lakatos, and the duty of good faith and fair

dealing implied in his employment contract.

181.    As a direct and proximate result of the foregoing, Dr. Lakatos has suffered and continues

to suffer loss of compensation and benefits, each in amounts to be proved at trial.

**COUNT IV**
**Violation of Florida Whistleblower Act under Florida Statute 448.102**
**(All Defendants)**

182.    This statute provides employees with protection where the employee does not accept,

tolerate or in fact reports an employer's violations of laws and statutes.  The Florida

Whistleblower Act applies to employers with more than 10 employees.  Defendants employ

more than 10 employees.

183.    To bring a whistleblower claim the whistleblower must show: that he or she was engaged

in a protected activity under the Florida Whistleblower Act, that the whistleblower

suffered some adverse employment action, and that the adverse employment action was

related to the actions of the whistleblower.  Dr. Lakatos's activities were protected

because they exposed a substantial and specific danger to the public's health, safety, or

welfare.  Dr. Lakatos was then fired for doing so.

**COUNT IV**
**DEFAMATION**
**(All Defendants)**

184.   Plaintiff realleges the above statement of facts as though fully stated here.

185.   Defendants made false statements about Dr. Lakatos in public.

186.   Dr. Lakatos suffered damages to his reputation and thus for finical damages in lower

    future wages due to the falsity of the statements made by Plaintiff.

187.   As a result of Defendants' false statements, they are liable to Dr. Lakatos for damages.

**PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants as follows:

    i.   An award of compensatory in terms of lost wages in the total amount of $562,720.00

    ii.   An award of costs associated with this action including attorneys fees; and

    iii.   Any and all other or further relief that this Court deems just and proper.

**JURY DEMAND**
    Plaintiff demands a trial by jury on all issues so triable.

Dated: April 11, 24

                                    Respectfully Submitted,

                                    /s/ Clea B. Efthimiadis
                                    Clea B. Efthimiadis
                                    888 Brickell Key Dr.
                                    Apt. 204
                                    Miami, FL 33131-2604
                                    (305) 528-1838
                                    cleaefthimidias@aol.com

                                    /s/ John M. Pierce
                                    John M. Pierce
                                    John Pierce Law, P.C.
                                    21550 Oxnard Street
                                    3rd Floor, PMB#172
                                    Woodland Hills, CA 91637
                                    (213) 279-7846

jpierce@johnpiercelaw.com
*Attorneys for Plaintiff*