### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

**Case No. 24-cv-21357-BLOOM/Elfenbein**

JASON M. LAKATOS,

      Plaintiff,

v.

FLORIDA IPS,

      Defendant.

_____/

### <u>ORDER ON MOTION TO DISMISS</u>

**THIS CAUSE** is before the Court upon Defendant Florida IPS Medical Services' ("IPS")
Motion to Dismiss Plaintiff's Third Amended Complaint ("Motion"), ECF No. [63], filed on
January 21, 2025. Plaintiff Jason M. Lakatos ("Dr. Lakatos"), filed a Response, ECF No. [65], to
which IPS filed a Reply, ECF No. [72]. The Court has reviewed the record, the supporting and
opposing submissions, the applicable law, and is otherwise fully advised. For the reasons that
follow, the Motion is granted in part and denied in part.

### I.     BACKGROUND

On April 11, 2024, Dr. Lakatos filed suit against Envision Healthcare ("Envision") and
HCA Healthcare. ECF No. [1]. Dr. Lakatos thereafter filed an Amended Complaint, ECF No. [10],
and then a Second Amended Complaint, ECF No. [25], against Envision and IPS. On August 12,
2024, the Court entered its Order dismissing Envision with prejudice and Dr. Lakatos was
"permanently enjoined from pursuing this action by Defendant's petition for relief under Chapter
11 of Title II of the United States Code, 11 U.S.C. §§ 101-1532, in the United States District Court
for the Southern District of Texas." ECF No. [47].

On December 6, 2024, the Court granted IPS's Motion to Dismiss without prejudice, ECF No. [55], and Dr. Lakatos was granted leave to file a Third Amended Complaint ("TAC") by December 20, 2024. *Id.* Dr. Lakatos timely filed his TAC[1] on December 19, 2024, ECF No. [56], and asserts five counts against IPS[2]: (1) Wrongful Termination/Breach of Contract; (2) Malicious Interference with Contractual Rights Under State Law; (3) Breach of Contract and Breach of the Implied Covenant of the Duty of Good Faith and Fair Dealing; (4) Violation of Florida Whistleblower Act under Florida Statute 448.102; and (5) Defamation.[3]

The facts alleged in the TAC are largely identical to the facts alleged in the Second Amended Complaint. ECF Nos. [25], [56]. Because the Court provided an exhaustive account of the factual background in its December 6, 2024 Order, ECF No. [55], it addresses only those allegations necessary to decide the Motion.

Dr. Lakatos alleges that he is an internal medicine physician who "worked the 'front line' of the COVID-19 pandemic. At a time when the world was more ignorant about the pandemic than it was knowledgeable, Dr. Lakatos dedicated himself to research in pursuit of the best way to treat his COVID-19 patients." ECF No. [56] at 1. In October 2018, Dr. Lakatos was recruited by "third-party employer" Envision to become "a full-time traveling hospitalist." *Id.* ¶¶ 10-12. Dr. Lakatos alleges that he "signed an employment agreement and completed the extensive credentialing

---

[1] Plaintiff captioned his operative complaint as his "Second Amended Complaint," however, it is his Third Amended Complaint. *See* ECF Nos. [1], [10], [25], [56]. Although on April 16, 2024, Dr. Lakatos filed three separate documents entitled "Amended Complaint," the multiple entries appear to be due to difficulties with docketing and do not present further amendments the Complaint.

[2] The TAC alleges that Dr. Lakatos is bringing these counts against "Envision Healthcare and Florida IPS Medical Services." ECF No. [56] at 1. In accordance with the Court's August 12, 2024 Order, the Court dismissed the TAC with prejudice as to Envision. ECF No. [62]. Therefore, only IPS remains in the suit.

[3] The TAC improperly referred to the defamation claim as "Count IV." The Court will use the correct numbering and refer to it as Count V.

packets for Envision." *Id.* ¶ 13. He further alleges that he "was guaranteed and required to work 1800 hours per year per his employment agreement with Envision Healthcare/Envision Physician Services." *Id.* ¶ 20. "During his employment with Envision . . . Dr. Lakatos was placed in various hospitals with physician deficiencies" including IPS facilities. *Id.* ¶ 22.

In the early months of the pandemic, "Dr. Lakatos applied his medical knowledge and research skills to identify medications that would aid in the fight against COVID and help his patients recover from an otherwise deadly disease." *Id.* ¶ 33. As a result of that research, Dr. Lakatos began using hydroxychloroquine ("HCQ") to treat COVID patients. *Id.* ¶ 37. Dr. Lakatos alleges his use of HCQ was successful and that he "strongly felt that he had indeed found a curative treatment regimen for COVID-19 and one without any significant side effects outside of simple effects (nausea, headache, diarrhea)." *Id.* ¶ 49. However, beginning in June 2020, IPS "required all COVID-19 patients to be treated with Remdesivir if they had confirmed positive COVID-19 and [their] oxygen saturations were less than 93%." *Id.* ¶ 63. Dr. Lakatos alleges that "[t]he hospitals tried to force [him] to treat his COVID-19 patients with this experimental drug Remdesivir instead of the safe and effective treatment course he had identified and successfully used for the last two-and-a half months." *Id.* ¶ 70. Although Dr. Lakatos attempted to prescribe HCQ, "[i]n mid to late June of 2020, pharmacists at both Lawnwood Regional Medical Center and Palms West Medical facilities began denying Dr. Lakatos's patients' prescriptions for HCQ." *Id.* ¶ 77. Despite being "banned from using that key medication as a form of treatment" Dr. Lakatos "refused to follow guidelines that recommended treatments that he had seen with proven harms and limited efficacy." *Id.* ¶¶ 81, 86. Dr. Lakatos alleges that around January 2021, "Lawnwood pharmacists started flatly refusing to fill [his] prescriptions without confirmation from Lawnwood CMO, Dr. Bakerman." *Id.* ¶ 99. In February 2021, Dr. Lakatos alleges, he "voiced his concerns during a phone call with Dr. Bakerman regarding Lawnwood treatment practices and procedures

as well as the alterations of his orders." *Id.* ¶ 100. During the phone call, Dr. Lakatos told Dr. Bakerman that "he was receiving emails from [Dr. Bakerman] instructing him on how to properly commit the fraud and . . . was not going to lie on HCA's behalf in his notes regarding these patients." *Id.* He also stated that "what the pharmacists were doing is essentially practicing medicine without a license." *Id*. After this conversation, "Dr. Bakerman decided to report Dr. Lakatos to the regional director for Envision and threatened to have him 'blackballed' and banned from [all IPS] facilities." *Id.* ¶ 102. Dr. Lakatos alleges that "[t]hese threats were a direct result of both Dr. Lakatos's attempts to prescribe HCQ, as well as his whistleblowing about many of the illegal medical practices undertaken" at IPS's Lawnwood Regional Medical Center. *Id.* ¶ 104.

Dr. Lakatos "felt admonished and very uncomfortable with continuing to work at this facility, so he requested a transfer[.]" *Id.* ¶ 105. Following his transfer to a new hospital, Dr. Lakatos "ordered his typical COVID-19 orders that he had been successfully using at Lawnwood over the last several months, including Ivermectin." *Id.* ¶ 107. However, "Dr. Lakatos received a phone call from the pharmacist stating he wasn't allowed to use this medication (Ivermectin) for COVID-19." *Id.* ¶ 108. The pharmacist stated that HCQ was also "not allowed for treatment of COVID-19." *Id.* Although Dr. Lakatos "tried to reason with the pharmacist and direct him to studies showing efficacy . . . the pharmacist said it didn't matter as this was . . . IPS corporate policy." *Id.* Dr. Lakatos subsequently "had a 20-minute discussion about Ivermectin" with the Chief Medical Officer, Dr. Jorge Gonzalez, and one of the pharmacists. *Id.* ¶ 109. During this conversation, Dr. Lakatos told the two individuals that he had previously been permitted to use Ivermectin to treat COVID-19 and he "didn't understand why this was a problem at this facility." *Id.* Dr. Lakatos also stated it was "illegal under the Florida Statutes for a pharmacist to interfere with a physician's treatment plan and orders." *Id.* ¶ 110. Dr. Gonzalez told Dr. Lakatos "he would

have to comply with HCA's Guidelines or [he would] not be allowed to work at the facility." *Id.* ¶ 111.

In June 2021, Dr. Lakatos moved to a new hospital—Lake City Medical Center—where the Director of Pharmacy told him that "he saw no issue with [Dr. Lakatos] using [HCQ] to treat COVID-19" although "Ivermectin was not available." *Id.* ¶¶ 114-15. From "June 2021 through about July 27, 2021, Dr. Lakatos was permitted to use the treatments he saw fit for COVID-19 including HCQ." *Id.* ¶ 116. However, on "July 27, 2021, Lake City Medical Center pharmacists began denying prescriptions sent by Dr. Lakatos" and he was told that "HCQ wasn't even allowed for COVID-19 patients who failed to benefit from Remdesivir or cases where it was contraindicated to use." *Id.* ¶ 117. "Dr. Lakatos was told the decision to block his orders had been made by the . . . IPS corporate Pharmacists." *Id.* ¶ 119. At this point, Dr. Lakatos alleges, he "felt that he would likely soon be fired from the hospital staff due to the ongoing dispute about the management of his COVID-19 patients." *Id.* ¶ 125. The IPS "hospitalist medical director, Dr. Dominguez, informed Dr. Lakatos that [Dr. Lakatos] was going to be fired from the hospital, and he had to leave immediately [by] 12:00 p.m. on August 5, 2021. Dr. Dominguez stated that this was at the request of the CEO Jill Adams [("Adams")]." *Id.* ¶ 129. Dr. Dominguez also "told Dr. Lakatos that he may have . . . violated [HIPAA] by posting a part of a case report to his Instagram story" although Dr. Lakatos responded that "there was 0 identifying patient information on his post and he was trying to spread knowledge that [HCQ] was an effective treatment for COVID-19." *Id.* ¶¶ 129, 132-33. Dr. Lakatos alleges that he "did not identify Hospital Corporation of America or Envision Healthcare in his story/post." *Id.* ¶ 134.

Dr. Lakatos alleges that "[a]round August 5, 2021, Dr. Lakatos was verbally reprimanded/yelled at for several minutes" by Adams "in her office with medical director Dr. Dominguez as a witness." *Id.* ¶ 140. Dr. Lakatos states he was "told he would never step foot in

another . . . IPS facility again[.]" *Id.* He further alleges he was "never mailed or emailed a written communication stating he was being barred from returning to work at any . . . IPS facility in the country." *Id.* ¶ 143. Dr. Lakatos alleges that, "[a]round the second week of August 2021," Adams had "effectively ban[ned]/blackball[ed] Dr. Lakatos from every . . . IPS facility in the country" and "convinced others within corporate . . . IPS that he would no longer be allowed to treat any patients in their facilities." *Id.* ¶ 146. Dr. Lakatos alleges that he was also told by Southern Regional Director for Envision's Ambassador/hospitalist program, Dr. Stephen Mitchell, "that there would be no hospitals he could be placed at to work in the future as most Envision contracted hospitals were through HCA." *Id.* ¶¶ 141, 147. Dr. Lakatos states he

> was told he would have to send in a resignation letter to Envision and . . . IPS and voluntarily resign his hospital staff privileges at 10 different . . . IPS hospitals. If this letter was not received by September 2021, he would be reported to the National Practitioners Database for 'unprofessional behavior' and likely unable to secure future employment in any hospitals, not just . . . IPS facilities. Faced with no other option, Dr. Lakatos sent this involuntary, coerced resignation letter to Envision and . . . IPS resulting in his wrongful termination of employment.

*Id.* ¶¶ 149-150.

By the time "he was wrongfully coerced into signing his termination [letter]" he had completed about 112 of the 180 shifts that were "guaranteed" in his contract. *Id.* ¶ 152. As a result of the termination, he "miss[ed] out on about $159,120." *Id.* Once he was no longer employed by IPS, "Dr. Lakatos struggled to find a new hospitalist position due to hospitals and companies requesting recommendations from past hospitalist positions." *Id.* ¶ 154. Although Dr. Lakatos found subsequent employment, he "made substantially less money after his loss of employment with Envision[.]" *Id.* ¶ 156.

In its Motion, IPS argues that Dr. Lakatos's TAC should be dismissed "in its entirety for failure to state a claim[.]" ECF No. [63] at 1. As to Count I, IPS contends it should be dismissed because (1) Dr. Lakatos improperly pled two causes of action in one count; (2) he failed to state a

claim for wrongful discharge; and (3) the breach of contract claim fails due to Dr. Lakatos's own admission that he resigned from IPS. *Id.* at 3-5. As to Count II, IPS asserts Dr. Lakatos failed to state a claim of malicious interference with contractual rights because (1) Dr. Lakatos's employment agreement was with IPS—not Envision—and IPS cannot interfere with its own contract; and (2) Dr. Lakatos failed to plead that any alleged interference by IPS was unjustified. *Id.* at 5-10. As to Count III, IPS asserts it is "merely a reiteration" of Count I and, because Dr. Lakatos has failed to state a claim for breach of contract in Count I, he "cannot sustain a breach of the implied covenant where there was no underlying breach." *Id.* at 10-11. As to Count IV, IPS states it should be dismissed because (1) Dr. Lakatos did not engage in protected activity; (2) Dr. Lakatos has failed to allege any actual violation of law or reasonable belief that IPS violated the law; (3) the allegations of hemodialysis fraud do not meet *Iqbal/Twombly* pleading standards; and (4) Dr. Lakatos has not cited any law, rule, or regulation violated. *Id.* at 11-16. As to Count V, IPS states (1) Dr. Lakatos failed to allege that the defamatory statement was published; and (2) the claim is time-barred. *Id.* at 16-18.

## II.   LEGAL STANDARD

"On a Rule 12(b)(6) motion to dismiss, '[t]he moving party bears the burden to show that the complaint should be dismissed.'" *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (quoting *Mendez–Arriola v. White Wilson Med. Ctr. PA*, No. 09-495, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010)). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation"). A complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true." *Sclar v. OsteoMed, L.P.*, No. 17-cv-23247, 2018 WL 559137, at * 1 (S.D. Fla. Jan. 24, 2018). Although the Court is required to accept factual allegations as true, this tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. In considering a Rule 12(b) motion to dismiss, the court is limited to the facts contained in the complaint and attached exhibits. *See Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006).

It is well-settled that "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute.") (citation omitted).

## III. DISCUSSION

### A. Wrongful Termination/Breach of Contract (Count I) and Breach of Contract and Implied Covenant of Duty of Good Faith and Fair Dealing (Count III)

"The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *People's Trust Ins. Co. v. Valentin*, 305 So. 3d 324, 326-27 (Fla. 3rd DCA 2020) (quoting *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081, 1094-95 (Fla. 3d DCA 2014). "Under Florida law, the implied covenant of good faith and fair dealing is part of every contract." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). The Eleventh Circuit "has held that a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Id.* at 1152. Additionally, "[a] claim for breach of the implied duty of good faith and fair dealing 'may be dismissed as redundant where the conduct allegedly violating the implied covenant is duplicative of the companion cause of action alleging breach of contract." *Popeyes La. Kitchen, Inc. v. Fla. Pop, LLC*, 723 F. Supp. 3d 1196, 1205 (S.D. Fla. 2024) (quoting *RRC Aruba, Ltd. v. Lionstone Grp., Inc.*, No. 05-cv-23060, 2006 WL 8433464, at *3 (S.D. Fla. Nov. 15, 2006)).

Because Dr. Lakatos's allegations regarding Counts I and III relate to IPS's alleged breach of its contract due to its failure to provide written notice to Dr. Lakatos prior to his discharge, the Court analyzes the two Counts together. In Count I, Dr. Lakatos alleges that IPS "wrongfully, intentionally, or maliciously discharged [him] when Dr. Lakatos prescribed a treatment that diverged from the one recommended by" IPS. ECF No. [56] ¶ 164. Dr. Lakatos asserts that his employment agreement with IPS requires "notice must be given for termination with cause upon

9

the occurrence of an event which constitutes grounds for termination" however he never received "any notice of the intent to terminate his employment as required by the contractual provisions of the employment agreement." *Id.* ¶¶ 168-69. In Count III, Dr. Lakatos asserts his employment agreement with IPS "contained express provisions detailing the manner in which the agreement could be terminated[,]" however, IPS "did not properly terminate the employment agreement." *Id.* ¶¶ 195-96. Dr. Lakatos notes that "both terminations without cause and with cause must be accompanied with written notice of the intent to terminate within the specified time frame." *Id.* ¶ 197.

In the Motion, IPS contends that Count I "appears to set forth two separate and distinct causes of action: (1) for wrongful termination . . . and (2) one for breach of contract[,]" thereby violating the "one claim per count rule[.]" ECF No. [63] at 3 (citing Fed. R. Civ. P. 10(b)). IPS also notes that Count III "is merely a reiteration of [Dr. Lakatos's] breach of contract claim, set forth in Count I." *Id.* at 11. In his Response, Dr. Lakatos clarifies that Count I is a claim of "wrongful termination based on a breach of contract as IPS terminated his employment in a manner which fails to follow the terms of the employment" and that "[t]his circuit has repeatedly been presented with breach of contract claims based on wrongful termination, none of which have been barred for being placed under the same count." ECF No. [65] at 6. As to Count III, Dr. Lakatos argues he "has pled more than just a mere contract breach and has additionally set forth IPS['s] malicious intention." *Id.* at 11.

In its Reply, IPS appears to concede that Dr. Lakatos is bringing a breach of contract claim based on wrongful termination in Count I. ECF No. [72] at 2 ("Thus, Plaintiff's claim of wrongful termination merely reiterates his breach of contract claim, and will be analyzed accordingly."). Although the title of Count I may suggest that Dr. Lakatos is bringing two causes of action under one count, viewing the TAC in the light most favorable to Plaintiff, the allegations make clear that

the reference to wrongful termination is necessary to describe his breach of contract claim. Therefore, Count I does not violate Fed. R. Civ. P. 10(b).

IPS does not dispute Dr. Lakatos's assertion that, had IPS terminated Dr. Lakatos, it would have been required to provide him with written notice, whether he was terminated with or without cause.[4] ECF Nos. [56] ¶¶ 165, 167; [56-1] at 4. Instead, IPS argues that Dr. Lakatos has failed to state a claim of breach of contract because "IPS'[s] written notice requirement was never triggered under the agreement" since Dr. Lakatos voluntarily resigned. ECF No. [63] at 4 (citing ECF No. [56] ¶¶ 149-50). Indeed Dr. Lakatos alleges that he was "told he would have to send in a resignation letter" and eventually "sent this involuntary, coerced resignation letter to Envision and . . . IPS[,] resulting in his wrongful termination of employment." ECF No. [56] ¶¶ 149-50. IPS contends that upon receiving Dr. Lakatos's resignation, it did not have a "reciprocal duty to provide notice to Dr. Lakatos of an intent to terminate the agreement." ECF No. [63] at 4. IPS argues that, by Dr. Lakatos's "own admission" he was responsible for the termination of the agreement, not IPS. *Id.* Moreover, it claims that Dr. Lakatos has not sufficiently alleged facts that would "establish a claim of coercion that would transform his resignation into a 'termination.'" ECF No. [72] at 3. The Court notes that, accepting the allegations as true, Dr. Lakatos explicitly alleged that the letter of resignation was "involuntary" and "coerced." *See* ECF No. [56] ¶ 150.

The Eleventh Circuit has held that "employee resignations are presumed to be voluntary." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). However, there are two situations in which an employee's resignation will be deemed involuntary: "(1) where the

---

[4] Because Dr. Lakatos attached his Employment Agreement to his TAC, the Court may consider the Employment Agreement in analyzing the Motion. *Thaeter*, 449 F.3d at 1352. The Employment Agreement states that it may be terminated without written notice under certain limited circumstances. ECF No. [56-1] at 4. Because IPS did not argue that any of those provisions were applicable here, such arguments are waived for purposes of the Motion. *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1282 n.11 (S.D. Fla. 2021).

employer forces the resignation by coercion or duress, or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." ECF No. [72] at 3 (citing *Hargray*, 57 F.3d at 1568). IPS argues that Dr. Lakatos's "alternative to resignation—i.e., being reported to the National Practitioner Database for 'unprofessional behavior'—may have been 'comparably unpleasant' [but] it does not rise to the level of coercion." ECF No. [72] at 4.

To determine whether a resignation was obtained by coercion or duress, courts "consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." *Hargray*, 57 F.3d at 1568. Although not dispositive, the Eleventh Circuit has considered five factors in making this determination:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

> *Id.*

IPS notes that the first two factors weigh against a finding of coercion because, had Dr. Lakatos been reported to the National Practitioner Database, he would have had the opportunity to dispute any of the allegations made by IPS, but Dr. Lakatos chose not to "stand pat and fight." ECF No. [72] at 4-5 (quoting *Hargray*, 57 F.3d at 1569). Although IPS states Dr. Lakatos "was not operating under time constraints that other courts found to be coercive," the timeline is not as straightforward as IPS suggests. *Id.* at 5. Dr. Lakatos alleges that "[a]round the second week of August 2021" Dr. Mitchell told Dr. Lakatos that Adams "had convinced others within corporate . . . IPS that he would no longer be allowed to treat any patients in their facilities." ECF No. [56] ¶ 146. This suggests that, by the second week of August, Dr. Lakatos may have already been constructively discharged if he was no longer permitted to treat patients in any IPS facilities.

Therefore, IPS may have already breached its obligation to provide written notice of Dr. Lakatos's discharge. Given the uncertainties regarding the timeline of Dr. Lakatos's departure from IPS, the Court does not determine at this stage whether Dr. Lakatos's resignation was voluntary. *G.F.B. Enters., LLC v. Toyota Motor Sales U.S.A, Inc*., No. 23-cv-20392, 2023 WL 2631467, at *2 (S.D. Fla. Mar. 24, 2023) ("A court cannot resolve a factual dispute in adjudicating a Rule 12(b)(6) motion to dismiss."). Dr. Lakatos has "plausibly alleged that [IPS] coerced [his] resignation," therefore, his breach of contract claim is "not due to be dismissed at this stage." *Bell v. Ala. Dep't of Hum. Res*., No. 2:16-cv-01658, 2017 WL 2443493, at *3 (N.D. Ala. June 6, 2017); *see also Claybrone v. Goldring Gulf Distrib.*, No. 3:12-cv-381, 2015 WL 5619523, at *6 (N.D. Fla. Aug. 27, 2015), *report and recommendation adopted*, No. 3:12-cv-381, 2015 WL 5595694 (N.D. Fla. Sept. 21, 2015) ("Because the facts must be read in the light most favorable to plaintiff, the court must consider as true plaintiff's contention that he was forced to resign after being advised that if he did not resign, he would be fired.").

Dr. Lakatos alleges that (1) he had an employment agreement with IPS; (2) IPS breached[5] the notice requirements of the termination provision of the agreement; and (3) had IPS complied with the 90-day notice requirement, he would have "average[d] about 18 twelve hour shifts, which at his hourly rate would be at minimum $175 and max $195 per shift." ECF No. [56] ¶¶151, 165,

---

[5] IPS has not argued that their failure to provide notice pursuant to the Employment Agreement was not a "material" breach of contract. "To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013). "As a general rule, '[t]he issue of whether an alleged breach is vital or material is reviewed as a question of fact.'" *O'Donnell v. Lee*, 387 So. 3d 447, 453 (Fla. 1st DCA 2024) (quoting *Covelli Fam., L.P. v. ABG5, L.L.C*., 977 So. 2d 749, 752 (Fla. 4th DCA 2008)). Because Dr. Lakatos has alleged that as a result of IPS's breach of the notice provision, he forewent—at minimum—$37,800 dollars in earnings, he has alleged a material breach of his Employment Agreement. ECF No. [56] ¶ 151.

167, 170. Therefore, he has alleged sufficient facts to establish a *prima facie* case of breach of contract.

Regarding Dr. Lakatos's allegation in Count III that IPS breached the implied covenant of the duty of good faith and fair dealing, IPS argues that it is "merely a reiteration of [Dr. Lakatos's] breach of contract claim, set forth in Count I." ECF No. [63] at 11. In both Counts I and III, Dr. Lakatos alleges that IPS breached its Employment Agreement "by failing to provide the proper notice prior to termination." *Id.* Indeed, in Count III, the only breach that Dr. Lakatos alleges is that IPS "did not properly terminate the Employment Agreement between itself and Dr. Lakatos according to the express notice of termination provision." ECF No. [56] ¶ 196. In his Response, Dr. Lakatos argues that the alleged breach of the implied covenant of good faith and fair dealing "goes beyond a simple breach of contract in that Dr. Lakatos has stated several acts that IPS committed which were of deliberate intent, i.e., threatening, coercing, falsely accusing, etc." ECF No. [65] at 12. However, Dr. Lakatos did not reference any additional breaches beyond the failure to provide notice of termination in Count III, nor may he amend his TAC in his Response. *Williams v. Miami-Dade Cnty.*, 740 F. Supp. 3d 1219, 1242 (S.D. Fla. 2024). Because Count III "presents the exact same allegations as those in [Dr. Lakatos's] breach of contract claim[,]" Count III is dismissed as redundant of Count I. *Z Indus. USA, LLC v. Circuitronix, LLC*, No. 17-cv-60727, 2017 WL 11718026, at *5 (S.D. Fla. Oct. 5, 2017).

### B. Malicious Interference with Contractual Rights (Count II)

Under Florida law, to state a claim for tortious interference with contractual rights, the plaintiff must allege "(1) the existence of an enforceable contract, (2) the defendant's knowledge of that contract, (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract, and (4) resulting damages." *Ace Pro Sound & Recording, LLC v. Albertson*, 512 F. Supp. 2d 1259, 1268 (S.D. Fla. 2007) (quoting *Mariscotti v. Merco Group At*

*Akoya, Inc.,* 917 So. 2d 890, 892 (Fla. 3d DCA 2005)). "The gravamen of an action for tortious

interference with a contractual relationship is the malicious interference by a third party, with a

contract between other persons, whereby one contracting party is induced to breach the contract to

the injury of the other." *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 1st DCA 1999) (quoting

*McKinney-Green, Inc. v. Davis*, 606 So. 2d 393, 397 (Fla. 1st DCA 1992)).

Dr. Lakatos alleges that "[a] full-time employment relationship existed between Envision

and Dr. Lakatos" and that "IPS was not a party to the contract between Envision and Dr. Lakatos."

ECF No. [56] ¶¶ 175, 178.  IPS argues that Dr. Lakatos's Employment Agreement was with IPS—

not Envision—and a party to a contract cannot interfere with its own contract. ECF No. [63] at 5.

As such, Count II must be dismissed for failure to state a claim. *Id.*

Dr. Lakatos responds by referring to the exhibits attached to the TAC as "clear evidence of

a contractual relationship between Envision and Dr. Lakatos." ECF No. [65] at 9. Exhibit 2, Dr.

Lakatos states, "is a 175-page enrollment packet of forms that are 'necessary for Envision

Enrollment to enroll [Dr. Lakatos] with the group(s) for which [he] contracted to provide

services[.]'" *Id.* (quoting ECF No. [56-2] at 2). However, as IPS notes, the document which Dr.

Lakatos describes as an "enrollment packet" merely allowed Envision to enroll Dr. Lakatos "with

payers such as Medicare, Medicaid, BlueCross Blue Shield, etc. for billing purposes." ECF No.

[63] at 6 (quoting ECF No. [56-2] at 2). Indeed, the language Dr. Lakatos quotes refers to "the

group(s) *for which you have contracted to provide services*," suggesting Dr. Lakatos has contracted

with an entity other than Envision. ECF No. [56-2] at 2 (emphasis added). Nothing about the

enrollment packet suggests that Dr. Lakatos is entering into an employment agreement with

Envision, nor does he point to any other portions of the enrollment packet to suggest as much.

Dr. Lakatos cites Exhibit 3 to the TAC as support that "IPS was not a party to the contract

between Envision and Dr. Lakatos." ECF No. [56] ¶ 178. Exhibit 3 states that copies of the

agreement are being sent to Envision. ECF No. [65] at 9 (citing ECF No. [56-3] at 5). The fact that copies of the signed agreement are to be sent to Envision in no way suggests that Dr. Lakatos entered into an agreement with Envision. Critically, Exhibit 3 clearly states "[t]his First Amendment to the Employment Agreement . . . is entered into by and between Florida IPS Medical Services, LLC . . . and Jason Michael Lakatos[.]" ECF No. [56-3] at 4. Even if Dr. Lakatos was correct that Envision was a party to the agreement—although that does not clearly appear to be the case—IPS was also a party. Therefore, Dr. Lakatos cannot bring a claim for tortious interference with a contractual relationship for allegedly interfering with the contract contained in Exhibit 3. *Allied Portables, LLC v. Youmans*, No. 2:15-cv-294, 2015 WL 6813669, at *7 (M.D. Fla. Nov. 6, 2015) ("[F]or the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship.") (quoting *Astro Tel, Inc. v. Verizon Fla*., LLC, 979 F. Supp. 2d 1284, 1297 (M.D. Fla. 2013)).

Lastly, Dr. Lakatos cites to Exhibit 4 attached to the TAC as evidence of a contractual relationship with Envision. ECF No. [65] at 9.  Dr. Lakatos specifically cites the portion of Exhibit 4 which states "[w]elcome and thank you for joining Envision Physician Services" and that the document "contains your new hire paperwork." *Id.* (quoting ECF No. [56-4] at 2). However, as IPS points out, Exhibit 4 also states

> [t]his handbook is not a contract and should not be construed as creating contractual obligations. Most clinicians enter into an employment agreement with the Employer regarding the terms and conditions of their employment. When such an agreement is made, the terms of that agreement establish the relationship of the parties and the provisions of that agreement control to the extent they conflict with provisions of this handbook. . . . I also understand that the clinician handbook is not a contract of employment or an offer for a contract of employment.

> ECF No. [56-4] at 71.

"Florida's courts have expressed a decided reluctance to find that provisions in an employee handbook or policies and procedures manual rise to the level of enforceable

16

contract rights" and Dr. Lakatos has not pointed to any "language in [Exhibit 4] expressly providing that the manual constitutes a separate employment agreement." *Walton v. Health Care Dist. of Palm Beach Cnty*., 862 So. 2d 852, 855 (Fla. 4th DCA 2003) (quoting *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 578 (Fla. 5th DCA 2002)). Because Dr. Lakatos has failed to allege that he had an enforceable contract with Envision—to which IPS was not a party—Count II is dismissed.

### C. Florida Private Whistleblower Act (Count IV)

The Florida Private Whistleblower Act ("FPWA") states, in relevant part, that an "employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102. Under the FPWA, a "'[l]aw, rule, or regulation' includes any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business." Fla. Stat. § 448.101(4). In order to state a claim under the FPWA, a plaintiff must allege "(1) protected activity, (2) a retaliatory personnel action and (3) a causal connection between the two." *Ounjian v. Globoforce, Inc*., 89 F.4th 852, 858 (11th Cir. 2023).

Dr. Lakatos appears to allege two separate bases for a cause of action under the FPWA. First, he states that IPS prohibited him from "treat[ing] his patients . . . according to his best professional judgment[.]" ECF No. [56] ¶ 209. Second, he states he was ordered by Dr. Bakerman "to lie on medical record[s] about the need for inpatient hospitalization[,]" but Dr. Lakatos "refused to take part in the hemodialysis fraud[.]" *Id.* ¶¶ 210-12. The Court analyzes these separate bases in turn.

i.      **AMA Code of Medical Ethics**

Dr. Lakatos alleges that the American Medical Association Code of Medical Ethics ("AMA Code") "articulates the values that ground the profession of medicine" and "states that physicians should prescribe treatments based solely on medical considerations, patient need, and reasonable effectiveness for the particular patient." *Id.* ¶ 203 (emphasis omitted) (quoting AMA Code of Medical Ethics, Opinion 9.6.6, https://code-medical-ethics.ama-assn.org/sites/amacoedb /files/2022-08/9.6.6.pdf (last visited Apr. 22, 2025)). Dr. Lakatos alleges that his COVID-19 patients "had responded better (in terms of recovery) to [HCQ] rather than Remdesivir." ECF No. [56] ¶ 207. However, the hospitals where Dr. Lakatos saw patients "tried to force Dr. Lakatos to treat his COVID-19 patients with this experimental drug Remdesivir instead of the safe and effective treatment course he had identified and successfully used[.]" *Id.* ¶ 70. Therefore, Dr. Lakatos alleges, by "terminating him for attempting to treat patients based on their best interests," IPS violated the FPWA. *Id.* ¶ 209.

IPS argues that the AMA Code does not fall under the FPWA's definition of "law, rule, or regulation," therefore, even assuming *arguendo* that Dr. Lakatos was refusing to comply with IPS's violation of the AMA Code, such a refusal would not constitute protected activity. ECF No. [63] at 12. As IPS notes, the AMA Code "does not flow from a legislatively enacted statute, ordinance, or administrative rule, nor did it originate from any federal source." *Id.* at 13. Dr. Lakatos responds that "[i]t would go against the Legislature's intention by stating that following the [AMA Code] is not the kind of guideline that would be promoted under this statute." ECF No. [65] at 12. However, Dr. Lakatos does not cite to any sources[6] to support his argument that the

---

[6] Dr. Lakatos cites *Padron v. BellSouth Telecommunications, Inc.,* 196 F. Supp. 2d 1250, 1250 (S.D. Fla. 2002) for the proposition that "under the Florida Whistleblower Act, an employee must establish an adverse employment action was inflicted upon them for refusing to engage in 'illegal **or unethical practices**.'" ECF No. [65] at 12-13. However, *Padron* does not support such a

Florida Legislature would have considered ethical guidelines, such as the AMA Code, to qualify as laws, rules, or regulations under the FPWA.

The Court must interpret the FPWA according to its plain text. *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 790 (Fla. 2d DCA 2005) ("[I]t is axiomatic that in construing a statute courts must first look at the actual language used in the statute.") (quoting *Woodham v. Blue Cross & Blue Shield of Fla., Inc.*, 829 So.2d 891, 897 (Fla. 2002)). To constitute a "law, rule, or regulation," the AMA Code would have to have been "adopted pursuant to any federal, state, or local statute or ordinance." Fla. Stat. § 448.101(4). Given that the AMA is a non-governmental organization and Dr. Lakatos has presented no evidence to suggest that the AMA Code is legally binding, the AMA Code cannot be considered a "law, rule, or regulation," as required by section 448.101(4). Therefore, it cannot form the basis of a FPWA claim.

### ii.      Hemodialysis Fraud

Dr. Lakatos also alleges that Chief Medical Officer, Dr. Bakerman, "ordered physicians to commit hemodialysis fraud" and "would order physicians to lie on medical record[s] about the need for inpatient hospitalization." ECF No. [56] ¶¶ 210, 211. Dr. Lakatos states that he "[r]efused to take part in the hemodialysis fraud" and "informed Stephen Mitchell about the hemodialysis

---

proposition. The *Padron* plaintiff alleged that "she was terminated and harassed for reporting *illegal* 'cramming' practices by Defendant BellSouth." 196 F. Supp. 2d at 1253 (emphasis added). Additionally, due to previous litigation involving disputes over alleged "cramming," Defendant "was obliged to comply with stipulations from the Statewide Prosecutor's Office." *Id.* at 1253. The Court in *Padron* never stated that opposition to conduct that is merely unethical could constitute protected activity. Instead, it stated that in order to prove a *prima facie* case under the Florida Whistleblower Act, "a plaintiff must establish '(1) that there was a statutorily protected participation; (2) that an adverse employment action occurred; and (3) that there was a causal link between the participation and the adverse employment action.'" 196 F. Supp. 2d at 1255 (quoting *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990)). The Court also stated that "[s]tatutorily protected participation is established if Plaintiff can show that she opposed an *unlawful* employment practice which she reasonably believed had occurred." *Id.* (emphasis added).

fraud." *Id.* ¶¶ 212, 214. Because "Dr. Lakatos did not want to be charged as an accomplice or tied

to the illegal acts . . . he chose to speak up, but he was fired instead." *Id.* ¶ 215.

IPS states that Dr. Lakatos's "vague allegations of 'hemodialysis' fraud" are insufficient

to state a claim under the FPWA because Dr. Lakatos "cites no specific law, rule, or regulation

that this alleged fraud violated." ECF No. [63] at 15-16. Although Dr. Lakatos alleges that IPS

"engaged in 'hemodialysis fraud,' . . . [he] provides no factual allegations as to what the

hemodialysis fraud *actually was.*" *Id.* at 16. IPS argues that, absent any "allegations as to how the

fraud was perpetrated, what the fraud involved, when it took place, or how 'hemodialysis' played

any part in it . . . IPS cannot be expected to respond to such conclusory and vague allegations."[7]

*Id.* Dr. Lakatos responds that "hemodialysis fraud is a statutory crime" and he "has alleged that he

was ordered to lie on medical records about the need for inpatient hospitalization." ECF No. [65]

at 14 (citing ECF No. [56] ¶ 211).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 560 U.S. at 570). Although this pleading requirement does not require the

---

[7] IPS also argues that, because Dr. Lakatos alleges that IPS engaged in fraud, his FPWA claim is subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, which requires that the plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Although Dr. Lakatos alleges that IPS engaged in "hemodialysis fraud," this claim merely supports his FPWA claim and, therefore, does not have to be pled with the particularity required by Rule 9(b). *See U.S. ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1302-1304 (11th Cir. 2010) (stating False Claims Act claim needed to be pled with particularity, but claim of retaliatory discharge was subject to Rule 8(a) pleading standard); *United States v. Orlando Heart & Vascular Ctr., LLC,* No. 6:19-cv-1884, 2022 WL 4483723, at *2 (M.D. Fla. Sept. 27, 2022) (causes of action under fraud statutes were subject to Rule 9(b), but claim under FPWA was only subject to Rule 8(a) pleading standard); *Burns v. Medtronic, Inc.,* No. 8:15-cv-2330, 2016 WL 3769369, at *3 (M.D. Fla. July 12, 2016) (fraud allegations that "merely support" non-fraud causes of action are not subject to Rule 9(b)). Therefore, Dr. Lakatos's FPWA claim, though it involves allegations of fraud, is only subject to Rule 8(a)'s pleading standard.

"particularity" of Rule 9(b)'s heightened pleading standard, it still "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Here, Dr. Lakatos has alleged that hemodialysis fraud "is a statutory crime" but his TAC does not cite any statute. ECF No. [65] at 14. The only factual details Dr. Lakatos provides regarding the alleged "illegal scheme" is that Dr. Bakerman "would order physicians to lie on medical record[s] about the need for inpatient hospitalization." ECF No. [56] ¶ 211. Dr. Lakatos does not state "how the fraud was perpetrated, what the fraud involved, when it took place, or how 'hemodialysis' played any part in it." ECF No. [63] at 16. Indeed, the allegation of "hemodialysis fraud" appears to be an afterthought given that it "does not appear at all in the first 209 paragraphs of the [TAC], leaving [IPS] to speculate as to what's being alleged." *Id*. Although plausibility "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the illegal acts, Dr. Lakatos states that he was personally ordered to engage in hemodialysis fraud. *Twombly*, 550 U.S. at 556. Therefore, Dr. Lakatos should be able to allege how the fraud was perpetrated, what the fraud involved, when it took place, or how "hemodialysis" played any part in it. Because he has failed to do so, Count IV must be dismissed.

### D. Defamation (Count V)

In order to state a claim for defamation, a plaintiff must allege "(1) publication; (2) falsity; (3) [that the] actor [acted] with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) [that the] statement [is] defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105-1106 (Fla. 2008). "Florida law imposes a two-year statute of limitations on defamation claims, Fla. Stat. § 95.11(5)(h), the limitations period begins to run from the time the cause of action accrues, Fla. Stat. § 95.031, and a defamation cause of action accrues on the date

of publication, Fla. Stat. § 770.07." *Button v. McCawley*, No. 24-cv-60911, 2025 WL 50431, at *4 (S.D. Fla. Jan. 8, 2025). A defendant may "raise a statute of limitations defense in a motion to dismiss if that defense appears on the face of the complaint." *Nationstar Mortg., LLC v. Sunderman*, 201 So. 3d 139, 140 (Fla. 3d DCA 2015).

Dr. Lakatos alleges that he was defamed during a meeting between Adams, Dr. Lakatos, and Dr. Dominguez when Adams "falsely accused Dr. Lakatos of committing a [HIPAA] violation." ECF No. [56] ¶¶ 218-19. Although Dr. Lakatos does not state exactly when the meeting took place, IPS argues the TAC "impl[ies] that the events in question took place in August 2021, on or just before the date of [Dr. Lakatos's] August 5, 2021 termination." ECF No. [63] at 17 (citing ECF No. [56] ¶¶ 129-140). Because the two-year statute of limitations period begins to accrue at the time of publication, Dr. Lakatos was required to file a defamation claim on or before August 5, 2023. However, as IPS notes, the original complaint was not filed until April 11, 2024, therefore, the statute of limitations has elapsed. ECF No. [1]. Even if the alleged defamation had taken place as late as September 2021—the deadline by which Dr. Lakatos states he was required to submit a resignation letter—the statute of limitations would still have elapsed before he filed his original complaint. ECF No. [56] ¶¶ 149, 189. Dr. Lakatos did not respond to IPS's argument that his defamation claim is time-barred. Therefore, he has conceded the argument and Count V is dismissed. *Sanz v. Am. Soc'y of Composers & Publishers*, No. 18-cv-24504, 2019 WL 13237013, at *5 (S.D. Fla. Aug. 7, 2019) (stating plaintiff "effectively conceded the claim" where he failed to respond to argument in a motion to dismiss); *see also Hurry v. Gen. Motors LLC*, 622 F. Supp. 3d 1132, 1149-50 (M.D. Ala. 2022) ("Where 'the dates alleged in the complaint make it clear that the statute of limitations bars [the plaintiff's] claims,' the plaintiff must 'allege[ ] facts supporting tolling of the statute of limitations' in order to avoid the limitations bar.") (quoting *Patel v. Diplomat 1419VA Hotels, LLC*, 605 F. App'x 965, 966 (11th Cir. 2015) (per curiam)).

**IV. LEAVE TO AMEND**

"[A] party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). District courts "have broad discretion in permitting or refusing to grant leave to amend." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts "may deny leave to amend the complaint 'where further amendment would be futile[.]'" *Heard v. Publix Supermarkets Inc.*, 808 F. App'x 904, 906 (11th Cir. 2020) (quoting *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019)). Eleventh Circuit precedent "is clear that '[a] district court is not required to grant a plaintiff leave to amend [her] complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.'" *Newbauer v. Carnival Corp.*, 26 F.4th 931, 936 (11th Cir. 2022) (quoting *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc)). The Eleventh Circuit has "never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor [has it] concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so." *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016).

Dr. Lakatos has had three opportunities to amend his complaint and has failed to cure the deficiencies regarding his claims for malicious interference with contractual rights (Count II), violation of the FPWA (Count IV), and defamation (Count V). ECF Nos. [1], [10], [25], [56]. Additionally, the Court determined that the breach of contract claim in Count III was duplicative of Count I. Because the Court, in its December 6, 2024 Order, provided detailed instructions as to how to cure the deficiencies in his complaint, Dr. Lakatos will not be granted a fourth opportunity to amend. ECF No. [55].

**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant's Motion to Dismiss, **ECF No. [63]**, is **GRANTED WITH PREJUCE** as
    to Counts II, III, IV, and V and **DENIED** as to Count I.

2.  IPS shall file an Answer to Count I of the TAC by **May 12, 2025**.

3.  The Court will enter an Order Amending the Scheduling Order, ECF No. [27].

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 28, 2025.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record